IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:21cr32 |
| | ) | |
| ANNE B. ROBINS, | ) | |
| Defendant. | ) | |

### Statement of Facts

The United States and the defendant, Anne B. Robins, stipulate that the allegations in the one-count Criminal Information and the following facts are true and correct. The United States and Robins further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

**I.    Introduction**

1.    As set forth in greater detail below, beginning at least in or about January 2010 and continuing thereafter through in or about June 2015, defendant Anne B. Robins ("Robins") unlawfully, voluntarily, intentionally, and knowingly conspired, combined, confederated, and agreed with M.C.M. and others to commit wire fraud, that is: having devised and intending to devise a scheme and artifice to defraud Prime Contractor #1, the National Aeronautics and Space Administration ("NASA"), and others, and to obtain from Prime Contractor #1 and NASA money and property by means of materially false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, and signals for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343.

2.      More specifically, starting in or about January 2010 and lasting through in or about June 2015, Robins conspired with M.C.M. and others to defraud Prime Contractor #1, a NASA prime contractor (and in turn, NASA) and others by, among other things:

      a.      fraudulently representing to Prime Contractor #1, NASA, the Small Business Administration ("SBA") and others that Company A was a woman-owned small business;

      b.      fraudulently representing to Prime Contractor #1, NASA, the SBA, and others that Robins, the titular head of Company A, owned and controlled Company A on a day-to-day basis, when in fact Robins did not do so and in fact had little to no involvement with the management and day-to-day control of Company A; and

      c.      fraudulently obtaining in excess of $25.5 million in gross payments made to Company A as a subcontractor on NASA prime government contracts as a result of those misrepresentations.

## II.    Factual Background

### A.    Company A and Company B

3.      Company A is a Florida corporation that provides various contracting support services at the Kennedy Space Center and Cape Canaveral Air Force Station. Company A was formed in or about 1994 by individuals working for Company B, a Pennsylvania-based company that provides engineering services nationwide.

4.      From the inception of both companies until shortly before his death in or about July 2013, L.M. controlled both Company A and Company B from Company B's offices in Pennsylvania. During the duration of Company A's existence, one of L.M.'s sons, M.C.M., was listed on Company A's annual corporate reports in Florida. In the time period leading up to and after L.M.'s death, M.C.M. took over control of both Company A and Company B.

5.      Robins worked for Company B as a recruiter from in or about 1980 through in or about 2013. In the early 1990s, at the direction of L.M.., D.K., and M.C.M., Robins agreed to become the titular and majority owner of Company B so that Company B could obtain government contracting preferences afforded to woman-owned small businesses.

*B.      Government Contracting Preferences for Woman-Owned Small Businesses*

6.      The SBA administers several programs designed to help different types of small businesses compete in the American economy through access to the federal procurement market. One of those programs is for women-owned small businesses, otherwise known as "WOSBs." In order to obtain access to federal government contracting preferences available to WOSBs, a purported WOSB must be at least 51 percent owned and operated by one or more women, and one or more women must control the company's management and daily operations. In addition, a woman must hold the highest officer position, manage the company on a full-time basis, and devote herself full-time to the company during its normal working hours.

7.      Pursuant to the applicable federal regulations, U.S. government prime contractors may rely in good faith on written representations by subcontractors claiming that they meet the criteria outlined above for WOSBs. Moreover, WOSBs may self-represent their status as a qualified WOSB directly to the government, and prime contractors may rely in turn on those self-representations. To self-represent, a claimed WOSB must register in a centralized electronic U.S. government database designed to track such information. From in or about December 2004 through in or about July 2012, that system was the Online Representations and Certifications Application ("ORCA"). In or about July 2012, the System for Award Management ("SAM") replaced ORCA for purposes of tracking self-representations of WOSBs. At approximately that same time, the ORCA records were transitioned to SAM.

3

    C.    *Company A's Use of Claimed WOSB Status to Obtain Government Contracting Work*

    8.    According to available SAM and ORCA records, Company A certified itself in ORCA and SAM as a qualified WOSB from at least on or about January 10, 2008, through on or about June 25, 2015. On or about June 25, 2015, Company A certified itself in SAM as a small business but did not certify itself as a WOSB.

    9.    On or about December 17, 2010, NASA awarded U.S. government contract # NNK11EA08C, also known as the "Engineering Services Contract" or "ESC," to Prime Contractor #1,[1] which provides technology development and products to the defense, security, and commercial markets worldwide. Prime Contractor #1 is headquartered in Waltham, Massachusetts, and has offices in Pittsburgh, Pennsylvania, and Ashburn, Virginia, within the Eastern District of Virginia. The ESC, the largest commercial contract at the Kennedy Space Center in Florida during this timeframe, required Prime Contractor #1 and its subcontractors to provide highly specialized technical services to help NASA modernize its systems and infrastructure in order to meet its strategic space technology objectives.

    10.    NASA awarded the ESC to Prime Contractor #1 based at least in part on Prime Contractor #1's representation that it would use Company A as a WOSB subcontractor, and Prime Contractor #1 made that representation based on Company A's representation that it was a WOSB. More specifically, as part of its proposal to NASA, Prime Contractor #1 included a subcontract proposal from Company A that stated that Company A "is a female owned, small business." In addition, Prime Contractor #1 incorporated other certifications and representations made directly to Prime Contractor #1 by the small businesses it cited as subcontractors, including Company A,

---

[1] In or about July 2014, another entity acquired Prime Contractor #1, which then changed its name. Both entities are referred to in this document as Prime Contractor #1.

and NASA relied on those representations by Prime Contractor #1. Those included Prime Contractor #1's representation in the Small Business Utilization Plan in its October 2010 proposal to NASA that Company A was a WOSB. In addition, at L.M.'s direction, Robins signed a Prime Contractor #1 form claiming WOSB status for Company A on or about December 15, 2010—two days before the ESC was awarded to Prime Contractor #1.

11.     Company A's representations that it was a WOSB, both within SAM and in the documents provided directly to Prime Contractor #1, were material to Prime Contractor #1's selection of Company A as a subcontractor to Prime Contractor #1 under the ESC because NASA had to meet certain small business goals in its awarding of contracts and subcontracts, and Prime Contractor #1 could thus earn additional scoring or points for a contract proposal containing WOSBs as anticipated subcontractors.

12.     From the beginning of the ESC through in or about August 2017, NASA paid Prime Contractor #1 more than $914 million for services on the ESC. In turn, Prime Contractor #1 paid Company A more than $25.5 million in payments for subcontracting work on the ESC during the same approximate timeframe. Company A earned more than $3.5 million but less than $9.5 million in profit from that subcontracting work. Prime Contractor #1 approved and made its payments to Company A based on invoices and other information submitted by Company A in Florida and sent either directly or through a Prime Contractor #1 intermediary by interstate wire communication (*i.e.*, email) to Prime Contractor #1's accounts payable department in Ashburn, Virginia, within the Eastern District of Virginia. Those included more than 550 invoices electronically transmitted by interstate wire communication from Florida to the Eastern District of Virginia.

### III.     Criminal Conduct

13.     Contrary to Company A's representations to Prime Contractor #1, the SBA, NASA, and other parties, Robins never actually controlled the day-to-day operations of Company A, nor did she meet the other requirements for Company A to be a WOSB. Rather, Robins served as a figurehead owner of Company A so that L.M., M.C.M., and others actually controlling Company A and Company B could obtain access to subcontracting work based on Company A's false representations that it was a WOSB.

14.     In or about 2008 or 2009, before Company A submitted its representations regarding its WOSB status to Prime Contractor #1, Robins read and reviewed the SBA regulations governing the WOSB program. Based on that review, Robins was aware that Company A did not qualify as a legitimate WOSB as defined by the SBA.

15.     Prior to Prime Contractor #1 being awarded the ESC, Robins also downloaded and reviewed other documentation regarding the WOSB program. Specifically, Robins downloaded the portion of the Federal Register that explains the WOSB requirements, and Robins downloaded an online article that explained the benefits to a contracting company of claiming WOSB status. Based on those documents, Robins was aware that Company A did not qualify as a WOSB at that time.

16.     In 2010, prior to Prime Contractor #1 being awarded the ESC by NASA, Robins discussed Company A's WOSB status with others at Company A and B, including M.C.M. For example, on or about July 20, 2010, Robins forwarded to M.C.M. an email from a Company A employee that talked about whether Company A would "decide to stay Woman owned" in the future. As Robins and others at Company A and Company B knew, the "decision" whether to "stay" a WOSB was made by L.M. and others at Company A and B based not on the actual, truthful

status of Company A, but rather based on whether fraudulently representing itself as a WOSB would be to Company A's financial advantage.

17.     On or about December 16, 2010, as part of the final process of obtaining Company A's subcontract with Prime Contractor #1 for work on the ESC, Robins sent two emails to G.K., a Company A employee, pertaining to Company A's falsely represented WOSB status. The first email included as an attachment a Prime Contractor #1 "Business Classification Form" that Robins had completed and signed. That form falsely stated that Company A was a WOSB. The form included a warning that stated:

> Seller is advised that the U.S. government may impose a penalty against a firm misrepresenting their business size and/or disadvantaged status. Eligibility as a small business is based on the regulations issued by the Small Business Administration in CFR 13, Part 121 of the SBA Rules and Regulations.

18.     The second email from Robins to G.K. on or about December 16, 2010, included a PDF titled "reps and certs" that included a 14-page Prime Contractor #1 "Annual Representations and Certifications" document that Robins had filled out to be submitted to Prime Contractor #1. On page 4 of that document, at L.M.'s direction, Robins checked the box falsely stating that Company A was a WOSB. Page 5 of that document explained the definition of a WOSB, which required that the "management and daily operations" of a company must be "controlled by one or more women" for that company to qualify as a WOSB. As Robins knew, she did not control the management and daily operations of Company A.

19.     Robins also knew that others at Company A falsely represented the company to be a WOSB to Prime Contractor #1. For example, on or about March 21, 2012, Robins forwarded the signature page of the subcontract agreement between Company A and Prime Contractor #1 to

M.C.M. and others in response to a request from M.C.M. That signature page falsely stated that Company A was a WOSB.

20.     In or about late 2012 and early 2013, as L.M. was battling health issues, M.C.M. and Robins began to discuss, by email and in person, the "succession planning" for Company A. During this time, M.C.M.—not Robins—practically controlled the management and day-to-day operations of Company A. In discussing the "succession planning" for Company A, M.C.M. and Robins were discussing moving the actual control and management of Company A from L.M. to M.C.M. and also moving the paper, titular ownership from Robins to M.C.M. Later in 2013, Robins left employment with Company B and ceased doing any work for Company A.

21.     In or about August 2014, K.S., a Company A employee, represented to Prime Contractor #2, another government prime contractor, that Company A was a WOSB. As K.S. knew—and had discussed with M.C.M. and others at Company A—this representation was false, both because Company A was never a WOSB and because Robins was not involved in Company A in any way at that time.

22.     During the time period set forth above, Robins derived financial benefit from Company A's misrepresentations, by her and through others, claiming WOSB status. More specifically, from in or about 2011 through 2013, Robins was paid approximately $7,843.76 in salary by Company A and approximately $35,418.78 in salary by Company B. Approximately $5,647.09 (or approximately 15.9%) of Robins's Company B salary was attributable to payments from Company A to Company B. Following her departure from the companies, Robins received a check in or about August 2014 for $115,000 from SDB as a buyout of her interest in SDB. In addition, Robins began to receive monthly payments starting in or about November 2013 of $2,083.33 as payment for previous bonuses that she had agreed to defer. In total, Robins received

or was due to receive approximately 60 such monthly payments totaling approximately $124,999.80. Those repayments were reflected in a loan agreement signed on or about August 19, 2014, for unpaid bonuses from calendar year 2006 ($100,000) and 2012 ($25,000). In sum, Robins benefited in the amount of at least approximately $183,262.34 during the time period of the conspiracy outlined above. However, the parties agree that Robins did not cause any substandard work to be performed by Company A on the ESC, nor are the parties aware as of the signing of this document and the accompanying plea agreement of any specific complaints regarding the standard of Company A's work that could be attributable to Robins.

23.     On or about July 7, 2016, federal law enforcement agents executed a search warrant of the Company A and Company B business locations. On that same date, agents interviewed Robins, who admitted that she had reviewed the SBA regulations, that she knew Company A did not qualify for WOSB status, and that M.C.M. took over day-to-day control of Company A when L.M. became sick and ultimately passed away. Robins falsely stated to agents at that time that she did not agree to allow Company A to represent itself as a WOSB to the federal government or other contractors.

**IV.     Conclusion**

24.     Robins's actions in furtherance of these offenses, including but not limited to the acts described above, were done willfully, knowingly, with the specific intent to violate the law, and not because of accident, mistake, or innocent reason.

25.     The foregoing statement of facts is a summary of the principal facts that constitute the legal elements of conspiracy to commit wire fraud. This summary does not describe all of the evidence that the United States would present at trial or all of the relevant conduct that would be used to determine Robins's sentence under the Sentencing Guidelines. Robins acknowledges that

the foregoing statement of facts does not describe all of Robins's conduct relating to the offense charged in this case.

Respectfully submitted,

Dana J. Boente
United States Attorney

By: _____
Ryan S. Faulconer
Samantha P. Bateman
Assistant United States Attorneys

10

    <u>Defendant's Stipulation and Signature</u>: After consulting with my attorneys and reviewing the above statement of facts, I stipulate that the above statement of facts is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proven the same beyond a reasonable doubt.


_Anne B. Robins_
Anne B. Robins
Defendant

    <u>Defense Counsel Signatures</u>: I am Anne B. Robins's attorney. I have carefully reviewed the above statement of facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.


_NiaLena Caravasos_
NiaLena Caravasos
Counsel for the Defendant
